| | | |
|---|---|---|
| **PATRICK SCHAUMBURG AUTOMOBILES,** | ) | |
| **INC., D/B/A PATRICK CADILLAC,** | ) | |
| | ) | |
| **Plaintiff** | ) | **Case No. 04 C 3925** |
| | ) | |
| **v.** | ) | **Consolidated with** |
| | ) | |
| **THE HANOVER INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |
| | ) | |
| **PATRICK EUROPEAN LLC,** | ) | |
| **D/B/A PATRICK BMW,** | ) | |
| | ) | |
| **Plaintiff** | ) | **Case No. 04 C 3926** |
| | ) | |
| **v.** | ) | **Magistrate Judge** |
| | ) | **Geraldine Soat Brown** |
| **THE HANOVER INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court are Plaintiffs' Rule 56 Motion for Partial Summary Judgment on Coverage [dkt 27], and Defendant's Motion for Summary Judgment [dkt 22]. For the reasons set out below, both motions are denied.

**JURISDICTION**

Federal jurisdiction exists in this case because of diversity of citizenship. 28 U.S.C. § 1332.

Plaintiffs Patrick Schaumburg Automobiles, Inc., d/b/a Patrick Cadillac ("Patrick Cadillac") and

Patrick European, LLC, d/b/a Patrick BMW ("Patrick BMW"), (collectively, "Plaintiffs"), are

Illinois corporations with their principal places of business in Cook County, Illinois. (Pls.' LR Resp.

¶ 1.)[1] Defendant Hanover Insurance Company ("Hanover") is a Massachusetts corporation with its

principal place of business in Worcester, Massachusetts. (*Id*. ¶ 2.) The parties do not dispute that

the amount in controversy exceeds $75,000. (*Id*. ¶ 3.)

## PROCEDURAL HISTORY

On June 9, 2004, Patrick Cadillac filed a complaint against Hanover, alleging breach of

contract and seeking damages and declaratory relief. [Dkt 1.] On the same day, Patrick BMW filed

an almost identical complaint against Hanover. [Dkt 1, 04 C 3926.] The only respect in which the

complaints appear to differ is the amount sought by each plaintiff. Patrick Cadillac claims it

suffered damages of $317,240 (Compl. ¶ 12), whereas Patrick BMW claims it suffered damages in

---

[1] The facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pls.' LR Resp. ¶ __" [dkt 34] and "Def.'s LR Resp. ¶ __" [dkt 36], and from the exhibits submitted with those statements and responses which are cited herein as: "Pls.' LR Ex. __" [dkt 26], Def.'s LR Ex. __" [dkt 24], and "Pls.' LR Resp. Ex. __" [dkt 34]. All citations to the record are to docket entries in Case No. 04 C 3925 unless otherwise noted.

Determining what facts are uncontested in this case is complicated by the parties' Local Rule 56.1 statements and responses. Some of their statements are not fact but argument. Also, contrary to the Local Rules, both parties at times responded with arguments, including reformulating the statements in their responses, instead of admitting the statement or denying it and citing to the record. (*See, e.g.*, Def.'s LR Stmt. ¶ 14; Pls.' LR Resp. ¶ 14; Pls.' LR Stmt. ¶ 13; Def.'s LR Resp. ¶ 14.) Local Rule statements and responses are not the place for argument. *See Hamilton v. O'Connor Chevrolet*, 399 F. Supp. 2d 860, 862-63 (N.D. Ill. 2005); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (stating that "a Rule 56.1(b)(3)(A) response is not the place for purely argumentative denials"). Statements not responded to or not controverted by specific reference to the record are deemed admitted. L.R. 56.1(b)(3).

the amount of $1,272,378 (Compl. ¶ 12, 04 C 3926). Hanover's motion to consolidate the two cases was granted [dkt 6, 7], and the cases were consolidated under Case No. 04 C 3925. The parties consented to the jurisdiction of a magistrate judge [dkt 8, 9], and the cases were assigned to this court pursuant to 28 U.S.C. § 636(c). [Dkt 10.]

## BACKGROUND

Plaintiffs are automobile dealerships. (Def.'s LR Resp. ¶ 9.) This action arises out of Plaintiffs' insurance claim for financial losses resulting from the dishonest activities of their former employee, David Hoffman ("Hoffman"). As part of their business, Plaintiffs purchase and sell used cars in the wholesale market from various wholesalers. (*Id.*) Hoffman worked for both Plaintiffs as a used car manager for approximately two years from 1999 to 2001.[2] (Pls.' LR Resp. ¶¶ 5, 8.) Over that time, Hoffman received kickbacks from accomplice wholesalers as part of a scheme in which he sold Plaintiffs' cars to accomplice wholesalers for an amount less than the cars' worth and bought cars from accomplice wholesalers for more than the cars' worth.[3]

Hanover issued a Commercial Crime Insurance Policy (the "Policy") that named Plaintiffs, among other Patrick companies, as insureds. (*Id.* ¶ 4; Def.'s LR Ex. A, Policy.) The Policy, described further below, includes coverage for loss resulting from employee dishonesty. (Def.'s LR

---

[2] From January 1, 1999 through October 1, 1999, Hoffman was employed by Patrick Cadillac. From October 1, 1999 through November 16, 2001, Hoffman was employed by Patrick BMW. (Pls.' LR Resp. ¶ 5.)

[3] According to a copy of what appears to be an indictment of Hoffman that Plaintiffs attach to their Reply, Hoffman was charged on March 10, 2004 with mail fraud in connection with his activities at Patrick BMW and Patrick Cadillac. (Pls.' Reply at Ex. A.) The parties indicated during oral argument that Hoffman entered into a plea agreement with respect to those charges. (Transcript of oral argument, Feb. 2, 2006 ("Tr.") at 5.) [Dkt 44.]

Resp. ¶ 7.)  The Policy was in effect during the relevant period.  (Pls.' LR Resp. ¶ 5.)  Plaintiffs made a claim under the Policy, and Hanover has already paid Plaintiffs part of their claimed loss. (Def.'s LR Resp. ¶¶ 5, 10, 11.)  Hanover does not dispute that Hoffman's activities constituted "employee dishonesty" as defined by the Policy.  (*Id.* ¶¶ 7, 11.)  Likewise, Hanover does not dispute that Plaintiffs incurred at least some covered financial loss resulting from Hoffman's dishonest activities.  (Def.'s Mem. at 1-2.)  At issue in the lawsuits is whether Hanover is liable for an additional amount that Plaintiffs claim is a covered loss under the Policy, and whether Plaintiffs' total recovery is subject to one or more limits of liability under the Policy.  (*See* Pls.' Mem. at 2; Def.'s Mem. at 5-6, 14.)[4]

## RELEVANT FACTS

### I. Hoffman's Dishonest Activities

Hoffman's actions involved two types of schemes, which the parties refer to as "Dishonest Activity One" and "Dishonest Activity Two."

#### A. "Dishonest Activity One"

In Hoffman's first scheme, he bought cars on behalf of one of the Plaintiffs from wholesaler accomplices for amounts greater than the cars were worth.  As a hypothetical example, Hoffman would arrange for one of the Plaintiffs to pay a wholesaler $20,000 for a car worth only $10,000. In exchange, the wholesaler paid Hoffman a kickback.  (*See* Pls.' Mem. at 3-4; Def.'s Resp. at 3-5.)

---

[4] The parties filed a total of six briefs on their respective motions.  Those briefs are cited herein as:  "Pls.' Mem." [dkt 28]; "Def.'s Resp." [dkt 31]; "Pls.' Reply" [dkt 38]; "Def.'s Mem." [dkt 23]; "Pls.' Resp." [dkt 33]; and "Def.'s Reply" [dkt 39].

As further discussed below, the actual "worth" of the cars is part of the parties' dispute.

### B. "Dishonest Activity Two"

Hoffman's second scheme involved selling cars on behalf of one of the Plaintiffs to wholesaler accomplices for less than the cars were worth. (Def.'s LR Resp. ¶ 10; *see* Pls.' Mem. at 4; Def.'s Resp. at 5-7.) As a hypothetical example, Hoffman would arrange for one of the Plaintiffs to sell a car worth $20,000 to a wholesaler for only $15,000. Hoffman then received a kickback from the wholesaler. (*See* Pls.' Mem. at 4.) Again, the actual "worth" of the cars is part of the dispute.

## II. Plaintiffs' Insurance Claim

Plaintiffs discovered Hoffman's activities in October 2001. (Pls.' LR Resp. ¶ 12.) Hundreds of cars were involved in both schemes. (*See* Def.'s LR Ex. E, 12/22/03 Report of Studler, Doyle & Co., LLC ("SDC Report") at 5; Tr. at 4.) On August 27, 2003, Plaintiffs submitted a Proof of Loss to Hanover, in the amount of $938,711, which Plaintiffs call a "Partial" Proof of Loss. (Pls.' LR Resp. ¶ 12; Def.'s LR Ex. D at 1.) Plaintiffs' calculation of their claimed loss in the August 27, 2003 Proof of Loss was based on a comparison between amounts earned from transactions that Hoffman arranged with colluding wholesalers and amounts earned from transactions with honest wholesalers involving cars of the same make and model. (*See* SDC Report at 8-9.)[5]

---

[5] That is how Hanover explained Plaintiffs' calculation in Hanover's Local Rule Statement ¶ 10. Plaintiffs' Response, although prefaced "Disputed," does not expressly respond to that statement, nor provide evidence that Hanover's statement is not correct. (Pls.' LR Resp. ¶ 10.) Therefore, the statement is deemed admitted.

In March 2004, Plaintiffs submitted a supplemental analysis to Hanover for their Proof of Loss, which the parties refer to as the "Black Book analysis." (Pls.' LR Resp. ¶ 14.) The "Black Book" database provides estimates of the wholesale values of cars. (Def.'s LR Stmt. ¶ 14; Pls.' LR Resp. ¶ 14.) The parties do not provide information about how "Black Book" estimates are made, or by whom, or how they are used in the industry or by Plaintiffs in the ordinary course of business. Plaintiffs' March 2004 Black Book analysis was based on their submission of VIN numbers, year, make, model, and mileage information for the cars involved in the Hoffman transactions to the Black Book database. (Def.'s LR Stmt. ¶ 14.)[6] Plaintiffs considered the Black Book estimates accurate estimates of the wholesale values of cars at any given point in time, but acknowledge that those estimates change weekly. (Pls.' LR Resp. ¶ 14.) During oral argument, Plaintiffs' counsel stated that the Black Book analysis was not part of Plaintiffs' initial Proof of Loss calculation because Plaintiffs were not aware at the time that the company that produces the Black Book maintains historical databases of Black Book estimates. (*See* Tr. at 38.) Plaintiffs submitted the Black Book analysis to Hanover as further support for their initial August 27, 2003 Proof of Loss. (Pls.' LR Resp ¶ 14.) Based on the Black Book analysis, Plaintiffs assert that their loss from Hoffman's dishonest acts while he was employed by Patrick Cadillac is $317,240.00. (*Id.* ¶ 5.) Patrick BMW's claimed loss for the period of Hoffman's employment is $1,272,378.00. (*Id.*)

Hanover's consultant, SDC, a CPA firm, calculated the "direct loss" to Plaintiffs at $79,178.55. (SDC Report at 10.) Hanover paid Plaintiffs $74,178.55 on their claim for loss resulting from Hoffman's dishonest activities, which Hanover asserts is payment of Plaintiffs' total

---

[6] Plaintiffs did not respond to that statement, and it is deemed admitted. (*See* Pls.' LR Resp. ¶ 14.)

covered loss (less a $5,000 deductible).  (Pls.' LR Resp. ¶ 7.)

### III.    The Policy

Several provisions of the Policy are relevant to the present motions.  The Employee Dishonesty Coverage of the Policy states, "We will pay for loss of, and loss from damage to, Covered Property resulting *directly from* the Covered Cause of Loss."  (Policy at Employee Dishonesty Coverage Form § A, emphasis added.)  "Covered Property" is defined as "'Money,' 'securities,' and 'property other than money and securities.'" (*Id.* § A.1.) The Employee Dishonesty Coverage is subject to other terms and conditions of the Policy, including the Crime General Provisions ("General Provisions").  (*Id.* § D.)

The General Provisions contain an exclusion, which states in relevant part:

> A.    GENERAL EXCLUSIONS
>       We will not pay for loss as specified below:
>       3.    *Indirect Loss*:   Loss that is an indirect result of any act or "occurrence" covered by this insurance including, but not limited to, loss resulting from:
>             a.    *Your inability to realize income that you would have realized had there been no loss of, or loss from damage to, Covered Property.*

(Pls.' LR Resp. ¶ 4; Policy at General Provisions § A.3.a, emphasis added.)

The Policy contains a limit of liability clause limiting the amount paid for any one "occurrence" to $500,000 (subject to the deductible).  (Pls.' LR Resp. ¶ 4; Policy at Employee Dishonesty Form § B, 10/01/98 Endorsement.)  "Occurrence" is defined as "all loss caused by, or involving, one or more 'employees', whether the result of a single act or series of acts."  (*Id.* § D.3.b.)  Finally, the General Provisions contain a subsection titled "Joint Insured," which states that "[a]n 'employee' of any Insured is considered to be an 'employee' of every Insured."  (*Id.* at

General Provisions § B.6.c.)  The Joint Insured subsection also provides that Hanover "will not pay more for loss sustained by more than one Insured than the amount [it] would pay if all the loss had been sustained by one Insured."  (*Id*. § B.6.e.)


## IV.    The Parties' Disputes about the Additional Claimed Loss

It is undisputed that Plaintiffs suffered some covered loss as a result of Hoffman's actions. Plaintiffs believe that the additional amounts they seek also represent a loss of Covered Property that resulted directly from Hoffman's acts.  Hanover believes that it has satisfied its obligations under the Policy, and that the "lost value" claimed by Plaintiffs is simply lost profits, which is not a loss covered by the Policy.  (Def.'s Resp. at 1-2.)  The dispute is best illustrated by taking hypothetical examples.

With respect to Dishonest Activity One, if Hoffman arranged for one of the Plaintiffs to pay an accomplice wholesaler $30,000 for a car with a Black Book estimate of $20,000, Plaintiffs argue that coverage in this situation should be calculated based on the difference between the amount the Plaintiff actually paid for the car and the car's Black Book estimate at the time of the purchase, which in this example would be $10,000.  In Plaintiffs' view, the transaction is equivalent to taking $10,000 out of Plaintiffs' checking account.  (*See* Pls.' Mem. at 3-4.)[7]

Hanover, however, argues that, in this example, after the purchase Plaintiffs had a vehicle which on their books they valued at $30,000.  (Def.'s Resp. at 3-5.)  In Hanover's view, the covered

---

[7] Plaintiffs' initial Memorandum uses the term "value" of the vehicle and does not refer expressly to the Black Book estimate.  (Pls.' Mem. at 7, 10.)  However, it is clear that Plaintiffs' view of the "actual value" is based on the Black Book estimates.  (*See* Pls.' LR Resp. ¶ 14; Def.'s LR Stmt. ¶ 14; *see also* Tr. at 18, 21.)

"direct loss" should be calculated based on whether Plaintiffs later "recouped" the initial purchase price in the transaction in which Plaintiffs later sold the car. (*Id*. at 3-5.) If Plaintiffs subsequently sold the car for less than $30,000 (say, $28,000), Hanover paid Plaintiffs the difference, in this example, $2,000. (*See* SDC Report at 7-8; Def.'s Resp. at 3.) However, if Plaintiffs subsequently sold the car for the same amount or more than the amount they paid the colluding wholesaler, Hanover determined the Plaintiffs had no direct loss (or possibly made a profit if the sale price was more than the purchase price) and therefore Plaintiffs were entitled to nothing from Hanover. (*See* SDC Report at 6-7; Def.'s Resp. at 3-5.) Plaintiffs, however, argue that the subsequent sale has nothing to do with the loss on the dishonest initial purchase which, they state, is never recouped. (Pls.' Mem. at 9.)

With respect to Dishonest Activity Two, if Hoffman sold a car with a Black Book estimate of $30,000 to an accomplice for $20,000, Plaintiffs argue that the covered loss is the difference, $10,000. (*Id*. at 4.) Plaintiffs characterize this as a "shortfall of cash." (*Id*. at 10.) According to Plaintiffs, the loss is calculated by deducting the amount received from the "wholesale 'value'" of the vehicle. (*Id*.)

Hanover, however, argues that coverage should be based on the difference between the amount Plaintiffs initially paid for the car, which is the cost of the car reflected on Plaintiffs' books, and the amount that Plaintiffs received for the car from the colluding wholesaler. (Def.'s Resp. at 5.) For example, if Plaintiffs initially bought a car for $30,000, it would be reflected on Plaintiffs' books at $30,000. If Hoffman later sold it to a colluding wholesaler for $28,000, Hanover would have paid Plaintiffs $2,000. (*Id*.) However, in cases where Plaintiffs sold the car to the accomplice wholesaler for *more* than the amount that the Plaintiff paid for it initially (*e.g.*, $35,000), Hanover

paid the Plaintiff nothing. Hanover asserts that in such situations, Plaintiffs recouped their entire initial cost and realized a $5,000 profit. (*See id.* at 5.)

Plaintiffs dispute Hanover's position that direct losses are to be calculated based on costs of the vehicles as reflected in Plaintiffs' books. (Pls.' Mem. at 13.) Instead, Plaintiffs claim that the loss should be calculated based on the "value" of the vehicle, which in Plaintiffs' view is the Black Book estimate. Plaintiffs' briefs do not state why or to what extent the "Black Book" estimate is different from the cost of the vehicle on Plaintiffs' books in the situation of Dishonest Activity Two, where there is no suggestion that the amount Plaintiffs paid in the original purchase was dishonest.

## V.     The Plaintiffs' Complaints and the Present Motions

In their complaints, Plaintiffs allege that Hanover breached the Policy by denying coverage for the additional amount that Plaintiffs claim is a covered loss, thus denying Plaintiffs the benefit of the Policy. (*See* Compls. ¶¶ 16-18.).[8] As relief for their breach of contract claim, Plaintiffs seek damages in the amounts sought, less the applicable deductible and the payment already received from Hanover. (*Id*. at 5.) Plaintiffs also seek a declaration that their "loss is covered under the Policy." (*Id*.)

In their motion, which they label as one for "partial summary judgment," Plaintiffs seek slightly different relief from the declaration they seek in their complaints. In their motion, Plaintiffs seek a "ruling" regarding the proper method of calculating Plaintiffs' loss under the Policy's terms:

> The purpose of this Motion is to secure from the Court a ruling regarding how Defendant's Employee Dishonesty insurance coverage applies to the Plaintiffs'

---

[8] Where paragraphs in the complaints from both cases are identical, they are cited as: "Compls. __."

financial losses arising from the dishonesty of its employee. This Motion is not designed to have the Court actually determine the amount owed under the Employee Dishonesty coverage. That question may be left for the trier of fact should the matter not resolve upon this Court's ruling on the interpretation of Defendant's policy coverage.

(Pls.' Mem. at 2.) Plaintiffs' brief also states:

Plaintiffs ask this Court to rule, as a matter of law, that the proper application of Defendant's policy is to apply the Valuation-Settlement clause to the direct loss resulting from the dishonest activity by subtracting the value of the car from the amount of the dishonest payment.

(*Id.* at 9.)

Hanover also moves for summary judgment in its favor, and requests that the court "find[] as a matter of law that (1) plaintiff[s'] claim for losses is excluded from coverage under the Policy; and (2) in the event th[e] court deems the exclusions from coverage discussed herein to be inapplicable to the instant matter, that plaintiff[s'] claim is but one occurrence under the Policy subject to a single limit of insurance."[9]  (Def.'s Mem. at 18-19.)

## LEGAL STANDARDS

### I.      Rule 56 Standards

Because part of the difficulty with the parties' motions is their procedural posture, it is important to review the standards for proceeding under Rule 56.

### A.      Summary judgment standard

---

[9] The complaints also request that the court find that Hanover's coverage position and its delay in paying Plaintiffs' claim is vexatious and unreasonable and award Plaintiffs relief pursuant to Section 155 of the Illinois Insurance Code.  (Compls. at 5.)  Because neither motion raises that issue, it is not addressed.

Summary judgment is warranted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of production to demonstrate the absence of a genuine issue of material fact:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)); *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*).

In cases where the nonmoving party has the burden of persuasion at trial, the moving party's initial burden is either to produce evidence negating an element of the nonmoving party's claim, or to simply show "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*). If the moving party fails to meet its initial burden, the nonmoving party has no obligation to produce anything. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1218, 1222 (7th Cir. 1984) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970)). If, however, the moving party succeeds in meeting its initial burden, the burden shifts to the nonmoving party, who must demonstrate that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005).

In determining whether a genuine issue of material fact exists, the evidence is viewed and all inferences are drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Smith v. Ball State Univ.*, 295 F.3d 763, 767 (7th Cir. 2002). An issue is "genuine"

when a trier of fact, viewing the evidence in a light most favorable to the nonmoving party, could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248; *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also First Ind. Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992) (citing *Anderson*). A court's role on summary judgment is not to weigh evidence. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

On cross-motions for summary judgment, the court evaluates each party's motion separately and on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Santaella*, 123 F.3d at 461; *Buttita v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992), *aff'd*, 9 F.3d 1198 (7th Cir. 1993). Even though the issues raised by the parties' motions may overlap, each motion must be addressed separately.

In short, a party seeking summary judgment must demonstrate that it is entitled to *judgment*, that is, that the facts before the court would not permit any other conclusion as a matter of law. On cross-motions for summary judgment, if neither party demonstrates that, neither party is entitled to summary judgment.

## B.       "Partial" summary judgment

Plaintiffs title their motion as one for "partial summary judgment." However, federal practice does not provide for "partial" summary judgment. Although courts occasionally refer to "partial summary judgment," the use of this term is discouraged because of its potential to cause

confusion. *See Minority Police Officers Assn. of South Bend v. City of South Bend*, 721 F.2d 197, 200 (7th Cir.1983) (stating that "[t]he word 'judgment' in the term 'partial summary judgment' is a misnomer"); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2737 at 322 (3d ed. 1998). Summary judgment may not be entered "for a portion of a single claim in suit." *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.*, 266 F.2d 200, 201 (7th Cir. 1959) (quoting *Biggins v. Oltmer Iron Works*, 154 F.2d 214, 216 (7th Cir. 1946)) (reversing "partial summary judgment" against plaintiff-insurers for the undisputed amount of the insured's claim, where an additional amount of that same claim remained disputed). *See also Capitol Records, Inc. v. Progress Record Distrib., Inc.*, 106 F.R.D. 25, 28-29 (N.D. Ill. 1985) (holding that a party is not entitled to "partial" summary judgment with respect to a portion of damages that defendant did not dispute) (citing *Biggins*).

However, federal practice does allow summary judgment on the issue of liability alone "although there is a genuine issue as to the amount of damages" under Fed. R. Civ. P. 56(c), and permits an order narrowing the issues for trial under Fed. R. Civ. P. 56(d).

### 1. Summary judgment on the issue of liability under Rule 56(c)

A court may enter a summary judgment order, interlocutory in character, on the issue of liability alone "although there is a genuine issue as to the amount of damages." Fed. R. Civ. P. 56(c); *see e.g., Capitol Records*, 106 F.R.D. at 30 (granting summary judgment on the issue of liability where the only remaining issue was calculation of damages); *see generally* 10B Wright, Miller & Kane, *supra*, § 2737.

On the other hand, in a case where the fact of damage or injury is an element of the claim,

there can be no liability without proof that there is injury or damage. In that situation, if there is a

question of fact as to the existence of any damages, summary judgment should not be granted.

"Rule 56(c) contemplates a procedure which clears away all matters except a prove-up or

computation of damages *after* the existence of some recoverable damages is established." *Berman*

*v. Thomson*, 45 F.R.D. 342, 344 (N.D. Ill. 1968) *vacated on other grounds*, 312 F. Supp. 1031 (N.D.

Ill. 1970) (denying summary judgment on liability where defendant's liability hinged on whether

there were recoverable damages).


### 2.      An order narrowing the issues under Rule 56(d)

Short of granting summary judgment, a court may enter an order under Fed. R. Civ. P. 56(d)

narrowing the triable issues. A court may enter an order specifying uncontroverted material facts.

*See Occidental Fire & Cas. Co. of N.C. v. Continental Bank N.A.*, 918 F.2d 1312, 1320 (7th Cir.

1990) (noting that under Rule 56(d) "the district court may issue an order, similar to a pretrial order,

listing the facts that are not in dispute"). Although Rule 56(d) appears compulsory (the court "*shall*

if practicable ascertain what material facts exist without substantial controversy . . ." and "*shall*

thereupon make an order specifying the facts that appear without substantial controversy . . . ."

(emphasis added)), if the court determines that specifying such facts would not materially expedite

the adjudication, it may decline to do so. *See* 10B Wright, Miller & Kane, *supra*, § 2737 at 319.

Rule 56(d) also permits the court to enter an order that narrows certain legal issues, including

causation and liability. *See Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 990 F.2d 342, 345-46 (7th

Cir. 1993) (finding that district court's holding regarding causation should not have been

characterized as a summary judgment, but instead as a ruling under Rule 56(d)).

The purpose of Rule 56(d) is to salvage some results from the judicial effort involved in evaluating, but ultimately denying, a summary judgment motion. *See* 10B Wright, Miller & Kane, *supra*, § 2737 at 318. An order under Rule 56(d) enables the parties to recognize more fully their rights, yet it permits the court to retain full power to completely adjudicate all aspects of the case when the proper time arrives. *See id.* Notably, however, an order under Rule 56(d) is designed to be "ancillary" to a summary judgment motion. *Id.* § 2737 at 316. A party may not make a separate motion for a Rule 56(d) order. *Arado v. General Fire Extinguisher Corp.*, 626 F. Supp. 506, 509 (N.D. Ill. 1985) (stating that "[t]here is no such thing as an independent motion under Rule 56(d)").

### C.  Applying Rule 56 standards to the claims in this case

This is a diversity case and the parties agree that Illinois law applies. Insurance policies are contracts, and the general rules of contract interpretation apply to the interpretation of insurance policies. *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). Plaintiffs' one-count complaints allege breach of contract. In the insurance context, a breach of contract claim alleges that the insurer "fail[ed] to pay the proceeds or provide such other benefits as are called for by the policy, without legal excuse." *See* 16 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 232:42 (3d ed. 1995). There are "six broad elements of the [breach of contract] claim" in the insurance context:

1.  The policy was in effect as to the time of the loss.
2.  The specific loss falls within the coverage terms of the policy.
3.  The amount of the covered loss is the amount claimed.
4.  The claimant is the entity entitled to the proceeds or benefits.
5.  The insurer's obligation to pay has matured; i.e., performance was, in fact, due at the time of the claim.
6.  The insurer has breached that obligation by denying the claim.

*Id.*

The insured bears the burden to establish that a claim falls within a policy's scope of coverage. *Farmers Auto Ins. Assn. v. Gitelson*, 801 N.E.2d 1064, 1071 (Ill. App. 1st Dist. 2003). The insurer bears the burden to show that a claim falls within an exclusion. *Id.*; *Sokol and Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 423 (7th Cir. 2005) (citing *Connecticut Spec. Ins. Co. v. Loop Paper Recycling, Inc.*, 824 N.E.2d 1125, 1130 (Ill. 2005)).

The insured also bears the burden of proving that it has incurred a loss caused by a peril covered under the policy. *See* 11 Russ & Segalla, *supra*, § 160:7 ("In a contract of indemnity against loss, the insurance company does not become liable until the insured has suffered a proven loss."); *id*. § 160:60 ("It has been held that there can be no recovery on a fidelity bond in the absence of loss or damage to the insured"); *id*. at § 185:34 ("Since fidelity insurance is an indemnity contract, the claimant must prove a loss in order to be entitled to recover . . . ."). The insured also bears the burden of proving the amount of covered loss. *St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 496 N.E.2d 1176, 1179 (Ill. App. 1st Dist. 1986) (reversing judgment for insured where insured failed to demonstrate what portion of loss was caused by a peril covered under its policy); *see also Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 856-57 (5th Cir. 2003) (holding that the insured failed to meet its burden to establish that a covered loss occurred when it did not produce any evidence of the value of the claimed loss). Summary judgment has been denied where the insured does not demonstrate the existence and extent of its claimed loss. *See Hartford Accident and Indem. Ins. Co. v. Washington Natl. Ins. Co.*, 638 F. Supp. 78, 81, 86-87 (N.D. Ill. 1986) (applying Illinois law and denying summary judgment on issue of insurer's liability under an insurance policy because the evidence before the court "d[id] not make clear the extent of

the direct loss [the insured] suffered”).

The standard for summary judgment is no different in insurance cases. When the facts are undisputed and an insurer's liability under an insurance policy turns on the construction of the policy's terms, the issue presented is a question of law that may be appropriately resolved on summary judgment. *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1169 (7th Cir. 1998); *T.H.E. Ins. Co. v. City of Alton*, 227 F.3d 802, 805 (7th Cir. 2000); *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000). When, however, an insurer's liability depends on factual issues, the court must follow the usual standards to determine whether there is a genuine issue of material fact. *See, e.g.*, *Spearman Indus., Inc. v. St. Paul Fire and Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1099 (N.D. Ill. 2001) (insurer's summary judgment motion regarding coverage denied because genuine issue of material fact existed as to cause of insured's damage); *Borrelli v. Unumprovident Corp.*, No. 01 C 6938, 2002 WL 31319476 at *4 (N.D. Ill. Oct. 11, 2002) (Darrah, J.) (same).

Applying those standards to the parties' motions, in order for Plaintiffs to be entitled to summary judgment even on liability alone, they must demonstrate that there is no genuine question of fact that at least some of the additional amounts they claim are a covered loss for which Hanover has not paid them. To be entitled to summary judgment in its own right, Hanover must demonstrate either that there is no genuine issue of fact that the unpaid amounts are not covered or that there is no question of fact that the unpaid amounts are subject to an exclusion. If there are genuine questions of fact regarding the right of either party to judgment as a matter of law, summary judgement may not be entered for either party. Also, the foregoing discussion demonstrates that Hanover's request for a ruling about the limit of coverage is not properly a motion for summary judgment. It is, in effect, a motion for an order under Rule 56(d).

## II.    Interpretation of Insurance Policies under Illinois Law

The parties dispute the meaning of two terms of the Policy:  First, the portion of the Employee Dishonesty Coverage of the Policy that states, "We will pay for loss of, and loss from damage to, Covered Property resulting *directly from* the Covered Cause of Loss" (Policy at Employee Dishonesty Coverage Form § A, emphasis added); and, second, the portion of the "General Exclusions" section of the General Provisions stating that the insurer will not pay for "Indirect Loss: Loss that is an *indirect result* of any act or 'occurrence'. . . including, but not limited to, loss resulting from:  [the insured's] *inability to realize income* that [the insured] would have realized had there been no loss of . . . Covered Property." (Policy at General Provisions § A.3.a, emphasis added.)

Interpretation of an insurance policy is a question of law. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992).  The primary objective in interpreting an insurance policy is to ascertain the intent of the parties.  *Id.* at 1212, 1215; *Sokol*, 430 F.3d at 420.  The policy is construed as a whole, with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract.  *Outboard Marine*, 607 N.E.2d at 1212 (citations omitted). Accordingly, the Policy terms at issue here should be interpreted in light of the purpose of insurance covering employee dishonesty, often referred to as fidelity insurance.  The purpose of fidelity insurance is to protect against loss arising from an employee's lack of honesty or fidelity in carrying out his or her duties.  *RBC Mortg. Co. v. National Union Fire Ins. Co. of Pittsburgh*, 812 N.E.2d 728, 733 (Ill. App. 1st Dist. 2004).

If the words of a policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning.  *Outboard Marine*, 607 N.E.2d at 1212.  If, however, the words are

susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer who drafted the policy. *Id.* The rule of construction in favor of coverage only comes into play when the term at issue is ambiguous. *Hobbs*, 823 N.E.2d at 564 (citing *Menke v. Country Mut. Ins. Co.*, 401 N.E.2d 539, 541 (Ill. 1980)). A contract is not ambiguous merely because the parties disagree on its meaning. *Central Ill. Light Co. v. Home Ins. Co*, 821 N.E.2d 206, 214 (Ill. 2004) (citing *Johnstowne Centre Partn. v. Chin*, 458 N.E.2d 480 (Ill. 1983)).

While Plaintiffs in this case argue at times that the Policy should be construed against Hanover as the drafter of the language, Plaintiffs do not actually contend that the Policy is ambiguous. Instead, Plaintiffs and Hanover argue that the contract unambiguously favors their respective positions. That fact, however, does not determine the question of ambiguity. "[A] contract is not necessarily unambiguous when, as here, each party insists that the language unambiguously supports its position. Rather, whether a contract is ambiguous is a question of law." *Id*. at 214 (citation omitted).

Illinois courts follow the "four corners rule" of contract interpretation, which requires that the court initially look to the language of the contract alone, and not to extrinsic evidence, to determine if the contract is ambiguous:

> An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.

*Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (quoting *Western Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (Ill. 1962)). In *Air Safety*, the Illinois Supreme Court rejected the "provisional admission" approach to contract interpretation, which would have allowed

a party to proffer parol evidence to establish an ambiguity although the language of a contract was facially unambiguous, because the contract at issue contained an integration clause. 706 N.E.2d at 885.[10] Although Illinois law requires the court to determine the plain, ordinary, and popular meaning of contract terms, because interpretation is a question of law, the court may also look to the way in which other courts have interpreted the same term. *See Borrelli*, 2002 WL 31319476 at *4; *Continental Cas. Co. v. Armstrong World Indus., Inc.*, 776 F. Supp. 1296, 1301 (N.D. Ill. 1991).

Other courts have not found the term "direct loss" in the context of fidelity insurance to be ambiguous. On the contrary, "[a]lthough there is no Illinois case addressing 'direct loss' in the context of fidelity insurance, the law, as extrapolated from other jurisdictions, is resoundingly uniform on this issue." *RBC Mortg.*, 812 N.E.2d at 733. The court in *RBC Mortg.* went on to define "direct loss": "Language in a fidelity bond, to the effect that the insured is covered for 'losses directly resulting from,' signifies a 'direct loss' or the actual depletion of bank funds caused by the employee's dishonest acts." *Id.* (citing *FDIC v. United Pacific Ins. Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994) (other citations omitted)).[11] In addition to the Illinois Appellate Court, other courts, including the Seventh Circuit, have cited with approval or relied on the interpretation of "losses

---

[10] It is not clear whether the Policy in this case contains an integration clause, because it is not clear whether Exhibit A attached to Hanover's Local Rule statement is the complete Policy or only the portion relating to the Employee Dishonesty Coverage.

[11] A court in this district recently declined to follow one aspect of *RBC Mortg.*, although in a respect that is not relevant to the dispute here. *Rothschild Inv. Corp. v. Travelers Cas. & Sur. Co. of Am.*, No. 05 C 3041, 2006 WL 1236148 at *10 (N.D. Ill. May 4, 2006) (Grady, J.). Specifically, *RBC Mortg.* rejected the proximate causation standard in determining whether a loss was a direct loss. 812 N.E.2d at 736-37. The court in *Rothschild*, however, suggested that proximate causation is the correct standard. 2006 WL 1236148 at *10. That is not relevant here because there is no suggestion that an intervening cause broke the chain of causation between Hoffman's dishonest activities and Plaintiffs' loss. The parties do not dispute that Plaintiffs' loss was caused by Hoffman.

directly resulting from . . ." set out in *United Pacific*, 20 F.3d at 1080: "[A] direct loss or the actual depletion of bank funds caused by the employee's dishonest acts . . . . Bookkeeping or theoretical losses, not accompanied by actual withdrawals of cash or other such pecuniary loss [are] not recoverable." *See, e.g., Cincinnati Ins. Co. v. Star Fin. Bank*, 35 F.3d 1186, 1191 (7th Cir. 1994).[12] A loss cannot be direct if it is not "ascertainable." *See RBC Mortg.*, 812 N.E.2d at 732. Notably, the potential for offsetting the loss is not relevant to the determination of whether a direct loss occurred. *United Pacific*, 20 F.3d at 1080-81.[13]

Likewise, the term of the Policy titled "Indirect Loss" that excludes "loss resulting from [the insured's] inability to realize income that [it] would have realized had there been no loss of, or loss from damage to, Covered Property," is not ambiguous. A similar, although not identical, "potential income" exclusion was construed by the Seventh Circuit in *U.S. Gypsum Co. v. Ins. Co. of N.A.*, 813 F.2d 856, 857, 858-59 (7th Cir. 1987), to exclude recovery of income that the insured could have earned had the employee dishonesty not taken place. The court distinguished between two types of "potential income" that a commercial asset represents. First, every asset "represents 'potential income' in the sense that, if it has value, it can be sold." *Id.* at 858. Loss of such income is not excluded from coverage. *Id.* Second, every asset also represents "potential income" in the sense that it can be used to generate income, for example, interest and dividends; that type of potential

---

[12] *See also Rothschild Inv.*, 2006 WL 12361248 at *9; *Oriental Fin. Group v. Fed. Ins. Co.*, 309 F. Supp. 2d 216, 222 (D.P.R. 2004); *Fireman's Fund Ins. Co. v. Special Olympics Intl., Inc.*, 249 F. Supp. 2d 19, 27 (D. Mass. 2003); *Lynch Prop., Inc. v. Potomac Ins. Co. of Ill.*, 962 F. Supp. 956, 961-62 (N.D. Tex. 1996).

[13] The parties have not addressed the issue of whether amounts received from Hoffman as restitution would be applied to offset any of Plaintiffs' insured loss. Therefore, this opinion does not discuss that issue.

income is subject to the exclusion. *Id.* at 859. The claimed loss in *U.S. Gypsum* was revenue from sales that were diverted from the insured to a competing company when one of the insured's employees leaked a trade secret to the competitor. That revenue, the court held, fell into the latter, excluded category. *Id.* at 858.

Courts in other jurisdictions have also interpreted similar potential income exclusions to exclude income that is more like interest or dividends, as opposed to income that represents the value of an asset. *See, e.g.*, *Diversified Group, Inc. v. Van Tassel*, 806 F.2d 1275, 1277-78 (5th Cir. 1987) (holding that a term excluding "[p]otential income, including but not limited to interest and dividends, not realized by the Insured" was not ambiguous and "excludes coverage for the loss of future profits, or future income flow, resulting from the fraudulent or dishonest acts of employees"); *FDIC v. Fidelity and Deposit Co. of Md.*, 827 F. Supp. 385, 390 (M.D. La. 1993) (holding interest not recoverable under potential income exclusion that excluded "potential income including but not limited to interest and dividends, not realized by the insured"); *First Am. State Bank v. Continental Ins. Co.*, 897 F.2d 319, 329 (8th Cir. 1990) (holding that future interest was not recoverable under potential income exclusion that excluded "[p]otential income, including but not limited to interest and dividends, not realized by the Insured because of a loss covered under this bond").

Plaintiffs rely on two cases that found a potential income exclusion to be ambiguous: *James B. Lansing Sound, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 801 F.2d 1560, 1565, 1566 (9th Cir. 1986) and *Koch Indus., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 89-1158-K, 1989 WL 158039 at *17-19 (D. Kan. Dec. 21, 1989) (Kelly, J.) *reconsideration denied*, 1990 WL 20021 (D. Kan. Feb. 20, 1990) (relying on *Lansing*). In *Lansing*, a dishonest employee sold his employer's product for less than the amount for which it should have been sold. 801 F.2d

at 1562.  Applying California law, the court held that an exclusion for "potential income such as interest and dividends" in the employer's fidelity policy was ambiguous as applied to the issue of replacement of the product.  Construing the exclusion against the insurer, the court held that the insured was entitled to recover the stipulated "fair market value"(or wholesale list price), not replacement cost.[14]  *Id*. at 1565, 1566.

However, the indirect loss exclusion at issue here is not ambiguous.  It is not modified by a reference to "interest and dividends", and read together with the term defining a Covered Loss as "loss of . . . Covered Property resulting directly from the Covered Cause of Loss," the Policy draws a distinction between the loss of the intrinsic value of the asset, which is Covered Property, and the loss of the asset's potential for generating income including profit, which is excluded.

The parties' motions are considered in light of those legal standards and principles of interpretation.

## ANALYSIS

### I.  Plaintiffs' Motion

Plaintiffs' motion is titled "Motion for Partial Summary Judgment on Coverage."  As discussed above, "partial summary judgment" is really a misnomer.  Plaintiffs argue that the only

---

[14] In its reply, Hanover asserts that the exclusions at issue in *Lansing* and *Koch* were part of a version of the "Comprehensive Dishonesty, Disappearance and Destruction Policy" ("CDDD"), which, according to Hanover, was prevalent between 1940 and 1986.  (Def.'s Reply at 1-2.)  According to Hanover, the CDDD exclusion for "potential income, including but not limited to interest and dividends, not realized by the insured because of a loss covered under this Policy" is "dramatically different" from the exclusion in the Policy here, which is quoted above.  (*Id.* at 2.)  However, Hanover acknowledges that the precise policy language at issue is not quoted in *Lansing* and *Koch*.  (*Id*.)  Apparently, Hanover's argument is based on some speculation.

issue is how the Policy terms apply to calculate the amount of Plaintiffs' additional claimed loss. (*See* Pls.' Mem. at 2.) They state that once the court determines the proper method of calculation of damages under the Policy, the only issue left to be decided would be the actual calculation of damages. (*See id.*; Pls.' Reply at 1.) Presumably, Plaintiffs are seeking summary judgment on the issue of liability alone pursuant to Rule 56(c).

Plaintiffs' framing of the issue in terms of calculation is not correct. As stated in Plaintiffs' complaints, the real issue is whether the additional claimed amount is a covered loss or excluded from coverage. Part of the relief Plaintiffs seek is a declaration that their additional claimed amount is a covered loss under the Policy. (Compls. at 5.) In contrast, Plaintiffs' motion does not seek a declaration that their loss is a covered loss, but instead seeks a declaration as to how the Policy terms apply to calculate the *amount* of Plaintiffs' additional claimed loss. (Pls.' Mem. at 9, 14.) In other words, their motion assumes the truth of the declaration they seek in their complaints—*i.e.*, that their additional claimed loss is a covered loss under the Policy. (*See id.* at 1; Pls.' Reply at 1.)

Plaintiffs maintain that it is "undisputed" that Plaintiffs' additional claimed loss is a covered loss. (*See* Pls.' Reply at 1, 3.) However, the only evidence that Plaintiffs identify in support of this purportedly undisputed fact is Hanover's previous payment to Plaintiffs. Hanover's previous payment of part of Plaintiffs' original insurance claim does not make coverage for the additional amounts Plaintiffs claim "undisputed," nor does it demonstrate the existence or the extent of any further damages.

Plaintiffs, as the insureds, have the burden to establish that their claimed loss is a covered loss. *Farmers Auto Ins.*, 801 N.E.2d at 1071. Thus, on their motion for summary judgment, their initial burden is to identify the parts of the record they believe establish that there is no genuine issue

of material fact. *Celotex*, 477 U.S. at 323. If Plaintiffs fail to meet their initial burden, Hanover as the nonmoving party has no obligation to produce anything, and summary judgment should be denied. *Yorger*, 733 F.2d at 1218, 1222 (citation omitted).

As the cases discussed above demonstrate, "the actual depletion of bank funds caused by the employee's dishonest acts" is a loss "resulting directly from" dishonest activity. *RBC Mortg.*, 812 N.E.2d at 731, 733. Thus, in this case, with respect to Dishonest Activity One (in which Plaintiffs paid more for cars than the cars' true worth), Plaintiffs' payment to the colluding wholesalers of amounts that Plaintiffs would not have paid but for Hoffman's dishonest activity is a covered loss. However, Plaintiffs have failed to eliminate any genuine dispute of fact regarding whether they have covered losses over and above what Hanover has already paid.

Plaintiffs' motion assumes that the Black Book estimates they presented to Hanover are accurate measures of the cars' "worth," and that any amount that Plaintiffs paid over the Black Book estimate was the result of Hoffman's dishonest activity. However, Plaintiffs present to the court no evidence to support that conclusion. Nowhere in the Local Rule statements or otherwise does Hanover admit that the Black Book estimate represents the true "worth" of the cars on the date Plaintiffs purchased them from the colluding wholesalers. Indeed, Plaintiffs' Local Rule 56.1 statement does not even propose that as an undisputed fact. In fact, Plaintiffs admit that "there are any number of ways for an insured to present evidence of what the car was really worth." (Pls.' Resp. at 8 n. 6.)[15]

_____

[15] Relevant to the question of whether the Black Book estimates represent a reliable basis for ascertaining the true value of the cars might be evidence such as the following: how Black Book estimates are created; how they are used in the industry; Plaintiffs' policies, if any, regarding the use of the Black Book by their salesmen in buying and selling used cars; the degree of discretion their salesmen have in deviating from the Black Book value in buying and

Plaintiffs' right to a judgment on their claimed loss with respect to Dishonest Activity Two (in which Plaintiffs claim Hoffman sold cars for less than the cars' "worth") is even less established. The activity of a dishonest employee in disposing of an insured's asset for less than its intrinsic value is a "direct loss." *See U.S. Gypsum*, 813 F.2d at 858 (stating that "[i]f an employee stole Gypsum's sole BISCO machine, the policy would presumably cover the cost of the machine"). Plaintiffs assert that the Black Book estimate represents the intrinsic value of a car, so that even evidence of the amount that one of the Plaintiffs paid for the car when it was acquired (presumably in an arm's-length transaction) as reflected in the cost of the cars on Plaintiffs' books should be totally disregarded. Hanover disputes Plaintiffs' position, and that question is material to the issue of whether Hanover has breached its obligation to Plaintiffs by failing to pay more than it has already paid.

Plaintiffs have not demonstrated that there is no genuine issue of fact so as to entitle them to judgment as a matter of law. Accordingly, Plaintiffs' motion for summary judgment is denied.

## II.    Hanover's Motion

Hanover seeks summary judgment in its favor on the ground that none of Plaintiffs' additional claimed loss is covered under the Policy, or alternatively, that even if Plaintiffs' additional claimed loss is a covered loss, it nevertheless falls within the Policy's indirect loss exclusion, and therefore is not recoverable. (Def.'s Mem. at 5-14, 18.) It does not automatically follow from the denial of Plaintiffs' motion for summary judgment that Hanover is entitled to summary judgment

---

selling used cars; and what factors other than the Black Book value, if any, are considered by their salesmen in buying and selling used cars.

in its favor.  As stated above, cross-motions for summary judgment are considered separately on their own merits.  *Santaella*, 123 F.3d at 461; *Buttitta*, 803 F. Supp. at 217.

### A.    The direct loss issue

In considering Hanover's motion, the court must, therefore, determine whether Hanover has met *its* initial burden.  At trial, Plaintiffs would have the burden to establish that their claimed loss is a covered loss (*Farmers Auto Ins.*, 801 N.E.2d at 1071), so Hanover's initial burden on summary judgment is to establish that there is an absence of evidence to support Plaintiffs' claim that they suffered a direct loss greater than the amount that Hanover has already paid.  *See Celotex*, 477 U.S. at 325.  In doing so, the court draws all reasonable inferences against Hanover.

On the record before the court, it is not possible to conclude that there is an absence of evidence to support Plaintiffs' claim that they suffered a "direct" loss greater than the amount that Hanover has already paid.  To start, Hanover acknowledges that Hoffman's activities resulted in at least some loss to Plaintiffs that is a "covered loss."  (Def.'s Mem. at 1-2.)  However, in its calculation of the amount to pay Plaintiffs for the loss represented by Dishonest Activity One (the overpayment), Hanover deducted amounts received by Plaintiffs in the subsequent transactions in which Plaintiffs resold the cars.  That was not correct.  *See, e.g., United Pacific*, 20 F.3d at 1080-81 (stating that a direct loss occurs when the funds are improperly diverted).  Those diverted funds were not recouped in subsequent arm's-length transactions.[16]  Additionally, Hanover acknowledges that the Black Book estimate provides at least a "price guide" for the wholesale values of cars.  (Def.'s

---

[16] Hanover has not suggested that Plaintiffs' subsequent sales of cars bought from colluding wholesalers were other than arm's-length transactions.

LR Stmt. ¶ 14.) That acknowledgment is some evidence to support Plaintiffs' claims that the Black Book estimate should be considered in determining the intrinsic value of the cars and that Hoffman's dishonest activity deprived Plaintiffs of that asset to an extent not compensated by the payments Hanover has already made.

In short, while Plaintiffs have not established that their covered loss actually consists of the amount they claim in their complaints, it may nevertheless be possible that Plaintiffs are entitled to an amount greater than what Hanover determined Plaintiffs' "direct" loss to be. Hanover has therefore failed to meet its initial burden to establish there is an absence of evidence to support Plaintiffs' claim.

Hanover makes one additional argument: that Plaintiffs' additional claimed loss is not a covered loss because it was never "owned or held" by Plaintiffs. (Def.'s Mem. at 9.) The requirement that Covered Property must be "owned or held" by the insured prevents an insured from recovering a third party's loss. *See e.g.*, *Lynch Prop.*, 962 F. Supp. at 962-63. However, here, it is clear that the cars at issue were assets in fact "owned or held" by Plaintiffs, that the funds that Plaintiffs paid to the colluding wholesalers in Dishonest Activity One were Plaintiffs' funds. Accordingly, that term does not preclude the possibility that Plaintiffs may be entitled to more than Hanover previously paid.

## B.  The "indirect loss" exclusion

The next issue is whether Hanover has established there is no genuine issue of material fact that Plaintiffs' additional claimed loss, even if it is a covered loss, nevertheless falls within the Policy's indirect loss exclusion, which excludes "loss resulting from: [the insured's] inability to

realize income that [the insured] would have realized had there been no loss of, or loss from damage to, Covered Property." (Policy at General Provisions § A.3.a.) Hanover, as the insurer, would have the burden at trial to establish that Plaintiffs' loss falls within that exclusion. *Connecticut Spec. Ins.*, 824 N.E.2d at 1130. Hanover's burden on its motion is to establish there is no genuine issue of material fact that Plaintiffs' additional claimed loss falls within the exclusion.

As discussed above, the indirect loss exclusion distinguishes between the loss represented by the asset's inherent value and the loss of unrealized income represented by the asset's potential for generating a return if it were put to use, including profits.

In this case, with respect to Dishonest Activity One (overpaying), to the extent Plaintiffs can establish that because of Hoffman's intentional and dishonest actions, Plaintiffs paid an ascertainable amount greater than the amount they would have paid in an arm's-length transaction, that ascertainable amount is a direct loss of Covered Property, not an inability to realize income. The indirect loss exclusion of the Policy does not exclude that loss.

The application with respect to Dishonest Activity Two (underselling) is more uncertain, in large part because the record before the court of the factual basis for Plaintiffs' claim arising from that activity is so undeveloped. Plaintiffs assert, with little factual support, that the intrinsic value of the cars is the Black Book estimate. Neither Plaintiffs nor Hanover has provided information about the sales to the colluding wholesaler. Presumably, the amounts received from the colluding wholesalers can be established. But the court has no information about how the amount received for a car compares to the price initially paid for the car, or about other factors that might be relevant to determining if the loss Plaintiffs claim is actually Covered Property or loss of income they expected to realize from the Covered Property. Without more information about the nature of the

claimed loss, it is impossible to determine whether the indirect loss exclusion excludes some, all, or none of that loss.  What is apparent is that Hanover has not established that, as a matter of law, all of Plaintiffs' additional claimed loss is subject to the indirect loss exclusion.[17]  Accordingly, Hanover's motion for summary judgment is denied.

## C.    Limit of liability

As discussed above, Hanover's motion includes a request that, if its motion for summary judgment is denied, the court rule that any covered loss is limited to $500,000.  (Def.'s Mem. at 14, 18-19.)  Hanover appears to be requesting that the court determine, as a matter of law, that the total recovery of both Plaintiffs is subject to one limit of liability.  Hanover's request is effectively a motion to narrow the issues under Rule 56(d), and federal practice does not allow such motions.

---

[17] Hanover argues that Plaintiffs' claim for "gross profits" in their August 2003 Proof of Loss (Def.'s LR Ex. D at 1), is a "judicial admission" that Plaintiffs are seeking lost profits and therefore potential income falling within the exclusion.  (Def.'s Mem. at 10-11.)  Hanover's argument is not correct.  As an initial matter, although Hanover relies on Illinois law, the issue is actually governed by federal law.  *See Bevolo v. Carter*, 447 F.3d 979, 982 (7th Cir. 2006) (stating that "[a]s a federal court sitting in diversity, we apply state law to resolve substantive questions and federal law to resolve procedural and evidentiary issues" (internal quotations and citation omitted)).

Furthermore, Plaintiffs' statement is not a judicial admission.  "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them."  *Keller v. U.S.*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995).  Plaintiffs' claim for "gross profits" on their Proof of Loss does not constitute a "formal" concession, as it is not made in a pleading or formal stipulation.  Plaintiffs' statement is, at most, an evidentiary admission.  *See Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1403-04 (7th Cir. 1997) (holding that defendant's financial statements containing information adverse to its defense were merely evidence to be considered, and not judicial admissions).  An evidentiary admission is not binding and is instead considered "'just . . . one more bit of evidence to weigh against' Plaintiff's position, and it may be controverted or explained by Plaintiff."  *Schwartz v. Graebel Van Lines, Inc.*, No. 05 C 4682, 2006 WL 1343533 at *6 (N.D. Ill. May 15, 2006) (Coar, J.) (quoting *Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000)).

*Arado*, 626 F. Supp. at 509.

Furthermore, a ruling under Rule 56(d) on that issue is not appropriate. The purpose of a ruling under Rule 56(d) is to salvage some results from the judicial effort involved in evaluating, but ultimately denying, a summary judgment motion. Here, the issue of whether there is one or more than one limit of liability is not part of the consideration of the cross-motions. It is a totally different legal issue, requiring different, additional factual and legal development. Furthermore, from the record before the court, it is not clear whether it will ever become necessary to decide the issue at all. In order for the limit of liability issue to be material, Plaintiffs would have to prove that they have covered losses which – net of any exclusion Hanover may prove – total in excess of $420,081.45 ($500,000 less than the amount Hanover has paid and the deductible, $79,178.55). The court will not speculate as to whether that will be the case. Accordingly, the limit of liability issue is not addressed.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Rule 56 Motion for Partial Summary Judgment on Coverage [dkt 27], and Defendant's Motion for Summary Judgment [dkt 22] are denied. A status hearing is set for October 12, 2006 at 10:30 a.m.

**IT IS SO ORDERED.**

*Geraldine Soat Brown*
**Geraldine Soat Brown**
**United States Magistrate Judge**

**Dated: September 28, 2006**